IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

CHARLESTON

MELISSA REXRODE,

       Plaintiff,

v.                            CASE NO. 2:09-cv-00153

MICHAEL J. ASTRUE,
Commissioner of Social Security,

       Defendant.

## M E M O R A N D U M   O P I N I O N

    This is an action seeking review of the decision of the Commissioner of Social Security denying Claimant's applications for disability insurance benefits ("DIB") and supplemental security income ("SSI"), under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 401-433, 1381-1383f. Both parties have consented in writing to a decision by the United States Magistrate Judge.

    Plaintiff, Melissa Rexrode (hereinafter referred to as "Claimant"), filed applications for SSI and DIB on March 31, 2005, alleging disability as of December 2, 2002, due to arthritis, fibromyalgia, carpal tunnel, back pain, and depression. (Tr. at 18, 65-67, 76-82, 115-34, 141-47, 578-80.) The claims were denied initially and upon reconsideration. (Tr. at 18, 55-57, 62-64, 582-84, 588-90.) On April 25, 2006, Claimant requested a hearing before an Administrative Law Judge ("ALJ"). (Tr. at 51.) The hearing was held on November 27, 2006, before the Honorable John

Murdock.  (Tr. at 43-47, 619-51.)  A supplemental hearing was held on June 11, 2007.  (Tr. 34-38, 652-95.)  By decision dated November 14, 2007, the ALJ determined that Claimant was not entitled to benefits.  (Tr. at 18-33.)  The ALJ's decision became the final decision of the Commissioner on December 19, 2008, when the Appeals Council denied Claimant's request for review.  (Tr. at 6-10.)  On February 20, 2009, Claimant brought the present action seeking judicial review of the administrative decision pursuant to 42 U.S.C. § 405(g).

Under 42 U.S.C. § 423(d)(5) and § 1382c(a)(3)(H)(I), a claimant for disability benefits has the burden of proving a disability. See Blalock v. Richardson, 483 F.2d 773, 774 (4th Cir. 1972).  A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable impairment which can be expected to last for a continuous period of not less than 12 months . . . ." 42 U.S.C. § 423(d)(1)(A).

The Social Security Regulations establish a "sequential evaluation" for the adjudication of disability claims.  20 C.F.R. §§ 404.1520, 416.920 (2002).  If an individual is found "not disabled" at any step, further inquiry is unnecessary.  Id. §§ 404.1520(a), 416.920(a).  The first inquiry under the sequence is whether a claimant is currently engaged in substantial gainful employment.  Id. §§ 404.1520(b), 416.920(b).  If the claimant is

not, the second inquiry is whether claimant suffers from a severe impairment.  Id. §§ 404.1520(c), 416.920(c).  If a severe impairment is present, the third inquiry is whether such impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4.  Id. §§ 404.1520(d), 416.920(d).  If it does, the claimant is found disabled and awarded benefits.  Id.  If it does not, the fourth inquiry is whether the claimant's impairments prevent the performance of past relevant work.  Id. §§ 404.1520(e), 416.920(e). By satisfying inquiry four, the claimant establishes a prima facie case of disability.  Hall v. Harris, 658 F.2d 260, 264 (4th Cir. 1981).  The burden then shifts to the Commissioner, McLain v. Schweiker, 715 F.2d 866, 868-69 (4th Cir. 1983), and leads to the fifth and final inquiry: whether the claimant is able to perform other forms of substantial gainful activity, considering claimant's remaining physical and mental capacities and claimant's age, education and prior work experience.  20 C.F.R. §§ 404.1520(f), 416.920(f) (2002).  The Commissioner must show two things: (1) that the claimant, considering claimant's age, education, work experience, skills and physical shortcomings, has the capacity to perform an alternative job, and (2) that this specific job exists in the national economy. McLamore v. Weinberger, 538 F.2d 572, 574 (4th Cir. 1976).

In this particular case, the ALJ determined that Claimant

satisfied the first inquiry because she has not engaged in substantial gainful activity since the alleged onset date. (Tr. at 20.) Under the second inquiry, the ALJ found that Claimant suffers from the severe impairments of obesity [5' 4", 254-278 pounds (Tr. at 259, 453, 612)], fibromyalgia, carpal tunnel syndrome, arthritis, and back pain. (Tr. at 20-25.) At the third inquiry, the ALJ concluded that Claimant's impairments do not meet or equal the level of severity of any listing in Appendix 1. (Tr. at 25.) The ALJ then found that Claimant has a residual functional capacity for light work, reduced by nonexertional limitations. (Tr. at 25-31.) As a result, Claimant cannot return to her past relevant work. (Tr. at 31-32.) Nevertheless, the ALJ concluded that Claimant could perform jobs such as deli worker, order accumulators, retail sales attendant, telemarketer, surveillance system monitor, and escort vehicle driver which exist in significant numbers in the national economy. (Tr. at 32-33.) On this basis, benefits were denied. (Tr. at 33.)

Scope of Review

The sole issue before this court is whether the final decision of the Commissioner denying the claim is supported by substantial evidence. In Blalock v. Richardson, substantial evidence was defined as

> "evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less

4

> than a preponderance. If there is evidence to
> justify a refusal to direct a verdict were the
> case before a jury, then there is 'substantial
> evidence.'"

Blalock v. Richardson, 483 F.2d 773, 776 (4th Cir. 1972) (quoting

Laws v. Cellebreze, 368 F.2d 640, 642 (4th Cir. 1966)).

Additionally, the Commissioner, not the court, is charged with

resolving conflicts in the evidence.  Hays v. Sullivan, 907 F.2d

1453, 1456 (4th Cir. 1990).  Nevertheless, the courts "must not

abdicate their traditional functions; they cannot escape their duty

to scrutinize the record as a whole to determine whether the

conclusions reached are rational." Oppenheim v. Finch, 495 F.2d

396, 397 (4th Cir. 1974).

A careful review of the record reveals the decision of the

Commissioner is supported by substantial evidence.

## Claimant's Background

Claimant was 36 years old at the time of the administrative

hearing.  (Tr. at 624.)  She has a tenth grade education, and a

GED.  (Tr. at 624-25.)  In the past, she worked as a waitress,

cook, secretary/receptionist, school bus driver, and home care

worker.  (Tr. at 638-44, 655-59, 678.)

## The Medical Record

The court has reviewed all evidence of record, including the

medical evidence of record, and will summarize it below.

## Physical Evidence

Records from Montgomery General Hospital [MGH], indicate

5

Claimant received examinations, treatment and/or testing on approximately 124 dates between September 15, 1994 to January 18, 2007. The various reasons for the hospital visits are: trigger point injections, bilateral knee pain, back pain, metabolic syndrome, hyperlipidemia, hypercholesterolemia, sunburn, chest pain, fibromyalgia, fatigue, stomach pain, abdominal pain, headache, diarrhea, vomiting, coughing, dizziness, nausea, back strain, neck strain, left foot pain, fever, eye pain, gastroesophageal reflux disease, pelvic pain, yeast infection, pap smear, vaginitis, cervicitis, vulvaginitis, pharyngitis, cervical dysplasia, cervical polyp, excision lipoma left buttock, hematoma left buttock, laceration mid leg, laceration right hand, cut to top of head, sore throat, earache, colpitis, right leg injury, pharyngitis, tonsilitis, depression, hypermenorrhea, dysmenorrhea, and a cold. (Tr. at 461-577.)

On March 31, 1995, Jose Chavez, M.D., performed a deep cone cervical biopsy on Claimant at Montgomery General Hospital. (Tr. at 375-76.) The surgical pathology report of Ben D. Muldong, M.D., dated April 3, 1995, stated "Diagnosis: 1. Acute and chronic erosive cervicitis. Comment: There is no dysplasia or malignancy." (Tr. at 377.) Largely illegible progress notes from Montgomery General Hospital dated from January 19, 1995 to February 28, 2000 appear to be gynecology records. (Tr. at 378-400.)

Claimant received treatment at Gauley Bridge Health Center

from February 3, 2001 to March 18, 2005.  Although most of the handwritten notes are illegible, what is readable indicates Claimant was treated for a variety of symptoms, including gross obesity, fibromyalgia, bronchitis, cough, sore throat, hyperlipidemia with hypertriglyceridemia, anxiety, gastritis, prescription refills, medication management, shoulder, lumbosacral, and abdominal pain.  (Tr. at 235-83.)

On January 19, 2002, Claimant sought treatment at MGH emergency room ("ER") following a home natural gas leak (heater pilot light off) for pain and burning in both eyes and soreness in mid chest when breathing.  (Tr. at 229-34.)  Chest x-rays revealed that Claimant's "heart and mediastinal structures are normal in appearance.  The lung fields and costophrenic angles are clear bilaterally.  Normal pulmonary vasculature."  (Tr. at 230.)  Her primary diagnosis was "allergic conjunctivitis, gas inhalation."  (Tr. at 231.)

On June 12, 2002, Claimant sought treatment at MGH ER for headache, cough, fever, and nausea. (Tr. at 220-27.)  Chest x-rays showed "cardiomegaly, accentuated by poor inspiratory effort.  The mediastinal structures are normal in appearance.  The lung fields and costophrenic angles are clear bilaterally.  Normal pulmonary vasculature."  (Tr. at 226.)

On November 13, 2002, Claimant sought treatment at MGH ER for pain in the lateral side of her left foot for three weeks.  (Tr. at

211-19.) An x-ray revealed no fracture or dislocation. (Tr. at 218.)   Claimant was diagnosed with osteoarthritis of the left foot and prescribed Advil.   (Tr. at 219.)

On December 12, 2002, Claimant sought treatment at MGH ER for coughing.   (Tr. at 200-10.) An chest x-ray revealed: "Cardiomegaly. The mediastinal structures are normal in appearance.   The lung fields and costophrenic angles are clear bilaterally.   Normal pulmonary vasculature."   (Tr. at 210.)   She was diagnosed with sinusitis.   (Tr. at 200.)

On June 25, 2003, Claimant sought treatment at MGH ER for heartburn and was diagnosed with epigastric pain.   (Tr. at 198-99.)

On August 11, 2003, Claimant sought treatment at the Rheumatology and Pulmonary Clinic for joint pain.   Wassim Saikali, M.D. stated:

> Impression:
> 1.   Fibromyalgia.
> 2.   Knee pain secondary to chondromalacia and possible early osteoarthritis given her being overweight... I will advise her to go for the fibromyalgia course in order to lose weight and do exercises as exercise is the only good way to lose weight and will help her with the chronic pain.   She is borrowing Flexeril and Darvocet from her mom.   Consequently, I will put her on one Darvocet a day as she is not taking it daily. I will giver her Flexeril, not to exceed 2 a day... I will also put her on Topamax to see if that will help her with the pain and maybe curb her appetite.

(Tr. at 401.)

On September 24, 2003, Dr. Saikali noted: "The patient is here for a follow up... She is still complaining of bilateral knee pain,

but she feels a little bit better.  She is trying to lose weight.
She lost 6 pounds on Topamax... The patient is in no acute
distress, overweight.  Weight 244 lbs."  (Tr. at 402.)

On November 18, 2003, Claimant sought treatment at MGH.
Following a laparoscopy, she was diagnosed with "gastroesophageal
reflux disease [GERD] with intestinal metaplasia of the
gastroesophageal junction (Barrett's equivalent)" by Mohamad
Sankari, M.D. (Tr. at 195.)  Dr. Sankari described Claimant's
physical appearance as "[a]n obese lady in no acute distress.  Body
Mass Index 42 kilogram/meter square."  (Id.)

On January 22, 2004, Dr. Saikali noted: "The patient is here
for a follow up...Her main complaint is low back pain... She is not
successful in losing the weight... Weight 248 lbs."  (Tr. at 402.)

On February 27, 2004, Claimant sought treatment at MGH ER for
vomiting, diarrhea, stomach pain, and headache.  (Tr. at 183-92.)
Claimant was diagnosed with gastroenteritis and prescribed Levaquin
and Phenergan by Wenqing Long, M.D.  (Tr. at 192.)

On May 4, 2004, Claimant sought treatment at MGH ER for chest
pain.  (Tr. at 160-82.) A chest x-ray showed "No active pulmonary
disease."  (Tr. at 168.)  She was diagnosed with "Atypical chest
pain, fibromyalgia."  (Tr. at 161.)

On August 31, 2004, Claimant sought treatment at MGH for
choking and dysphagia.   (Tr. at 155-59.)   Following an
esophagogastroduodenoscopy with esophageal biopsies, Dr. Sankari

9

gave a provisional diagnosis of "1.   Intermittent dysphagia.   2.
History of short segment of Barrett's."   (Tr. at 156.)   His report
noted:

> The duodenum looked normal, particularly the duodenal
> bulb was normal in shape with no evidence of ulcerations
> or erosions.  The stomach was also normal.  There were no
> ulcerations, erosions, no arteriovenous malformations, no
> polyps and no varices.  In the esophagus the Z-line was
> irregular located at around 37 cm. From the incisors.
> Biopsies were taken and were sent for pathological
> examination.  No ulcerations, erosion, strictures, or
> varices.

(Tr. at 157.)

On February 4, 2005, Claimant had a CT scan of the abdomen and
pelvis at Thomas Memorial Hospital.   A report indicates:
"Impression:  Minimal fatty infiltration of the liver.   No
intraabdominal or pelvic inflammatory changes or free fluid."   (Tr.
at 335.)

On June 23, 2005, Claimant had a chest x-ray at Thomas
Memorial Hospital, which revealed:  "The heart is normal in size.
The lungs are clear.   There is no active or acute pulmonary disease
process seen.  Pulmonary vascularity is within normal limits.   The
pleural spaces are clear."   (Tr. at 334.)

On June 30, 2005, Claimant was admitted to Thomas Memorial
Hospital with "dysfunctional uterine bleeding and dysmenorrhea."
(Tr. at 326.)   Bernard J. Luby, M.D., performed a diagnostic
hysteroscopy and laparoscopy.   (Tr. at 329-34.)

On July 6, 2005, Claimant was evaluated by Joseph DeVono, III,

D.O., South Charleston Cardiodiagnostics.  Dr. DeVono reported that Claimant's echocardiogram report indicated: "1) Normal left ventricular function and wall motion.  2) Trace mitral and tricuspid regurgitation." (Tr. at 312.)  He also indicated:  "The patient was monitored for 23 hours 47 minutes.  The average heart rate was 112/bpm [beats per minute] with the minimum rate of 79/bpm...The underlying rhythm was normal sinus rhythm with sinus tachycardia.  There were no ventricular premature beats.  There were no supraventricular premature beats.  The patient kept the diary and listed symptoms of lightheadedness with no associated arrhythmias." (Tr. at 314.)

On July 22, 2005, a State agency medical source completed a Physical Residual Functional Capacity Assessment and opined that Claimant could perform light work with the ability to do all postural activities occasionally, and with no manipulative, visual, or communicative limitations.  (Tr. at 284-88.)  Claimant's only environmental limitations were to avoid concentrated exposure to extreme temperatures, vibration, fumes, odors, dusts, gases, poor ventilation, and hazards.  (Tr. at 288.)  The evaluator, Gomez A. Rafael, M.D., noted:

> Patient is not fully credible.  She has multiple allegations but is very active.  She has diagnosis of fibromyalgia, back pain, multiple arthralgias.  She said she has carpal tunnel, however has no limitations with her hands.  Has morbid obesity, level III and h/o of asthma.  She is reduced to light work with postural limitations.

(Tr. at 289.)

On August 2, 2005, Anand Chockalingham, M.D., South Charleston Cardiology Associates, stated that Claimant was being seen

> for follow up cardiac evaluation. She does not have any chest pain, dizziness or syncope. She has palpitations which are on and off with activity. She has shortness of breath with climbing stairs and uphill walking... Recommendations: 1) We will perform a treadmill nuclear stress test given her exertional shortness of breath which is a new onset. 2) I strongly counseled her about significant weight reduction to improve her long term vascular risks given her multiple factors. 3) We will also put her on Atenolol 25 mg q.d. following the tests..."

(Tr. at 310-11.)

On July 29, 2005 Mohamad Sankari, M.D. stated "The patient underwent her hysterectomy and during her laparoscopy, it was noted that her liver was fatty which is a well-known fact on this patient. She is doing well vis-a-vis her gastroesophageal reflux disease [GERD] on... Prevacid...and Axid...at bedtime. She has added 15 pounds in the last year." (Tr. at 419.) Records indicate Dr. Sankari treated Claimant for GERD from March 9, 2001 to October 31, 2006. (Tr. at 419-449.)

Notes from Samar Sankari, M.D., Montgomery General Hospital, dated August 18, 2005 are largely illegible, but appear to state in part: "WT [weight] 243...gained 60 lb [pound] in 2 years." (Tr. at 317-18.)

On August 24, 2005, B. J. Wazir, M.D., South Charleston Cardiologists, reported on Claimant's treadmill stress test: "1)

Normal dual isotope perfusion scan.  2) Normal left ventricular function and wall motion.  3) L.V.Ej.Fr. OF 61%.  4) Normal exercise EKG."  (Tr. at 308.)

On October 4, 2005, Claimant was admitted to the Thomas Memorial Hospital with complaints of left side abdominal pain. (Tr. at 324-25.) On October 5, 2005, Claimant had a CT scan at Thomas Memorial Hospital which revealed: "The appendix is identified and is normal in size, it is retrocecal in location. The adrenal glands are normal in size and configuration. Impression: Fatty density of the liver is noted.  Otherwise, negative exam for without oral and IV contrast."  (Tr. at 323.)

On December 6, 2005, Ronald Dee Bowe, III, M.D., stated that Claimant was at his office to establish care.  He stated that her

> biggest complaint is her fibromyalgia.  She describes
> diffuse overall muscle aches in the back, arms, and legs.
> She describes it as full body toothache sensation... The
> only thing that the patient takes regularly now is
> Flexeril which does help.  The patient does have flares
> and will occasionally get injections, but is no longer
> seeing Dr. Ramesh who did this for her... I have
> encouraged the patient to join an exercise program.
> Water aerobics would be ideal for her... Endometriosis.
> She is scheduled for a hysterectomy on Monday.

(Tr. at 468-69.)

On December 12, 2005, Dr. Chockalingham noted "The patient has not been taking her Atenolol following the surgery...status post hysterectomy two days ago... normal left ventricular function; negative stress test a few months ago.  Recommendations: At this time, we will restart the Atenolol and given her negative

13

electrocardiogram, she will not require any further testing at this time." (Tr. at 408-09.)

On March 30, 2006, a State agency medical source completed a Physical Residual Functional Capacity Assessment and opined that Claimant could perform light work with the ability to do all postural activities occasionally, except climbing ladder/rope/ scaffold, which could never be done, and with no manipulative, visual, or communicative limitations. (Tr. at 367-71.) Claimant's only environmental limitations were to avoid concentrated exposure to vibration and hazards. (Tr. at 371.) The evaluator, Amy Wirts, M.D., noted: "Claimant is morbidly obese with BMI [body mass index] 44. Agree with credibility statement on page 8...Credibility: Clmt [claimant] not fully credible: MER [medical evidence of record] notes "no neuro deficit", clmt alleges she had problems filling out ADL form because her arms got tired." (Tr. at 372, 374.)

On August 24, 2006, a prescription from Ronald Dee Bowe, III, M.D. states: "Back brace Dx [diagnosis] back pain.  Ankle brace Dx pain." (Tr. at 450.)

On January 24, 2007, Kip Beard, M.D. provided a consultative examination report for the West Virginia Disability Determination Service. (Tr. at 451-56.) Dr. Beard examined Claimant and reviewed medical records.  He provided this summary:

> The claimant is a 37-year-old female with a history of
> chronic back pain following injury.  Examination of the
> back and neck today reveals some mild pain and muscular
> tenderness at the lower back with some mild range of

motion loss. Reflexes appeared normal. There was no evidence of radiculopathy present. There is also history joint pain. Records indicate a diagnosis of early osteoarthritis or chondromalacia patella. Examination today reveals some mild patellar femoral crepitus at the knees. There was some mild range of motion loss. There was some pain and tenderness at the knees.

Regarding fibromyalgia, there was muscular tenderness on examination today but this did not seem to be specific or diagnostic.

Regarding carpal tunnel syndrome, examination reveals no intrinsic hand atrophy or sensory loss. Provocation testing was mildly positive. Manipulation was well preserved. Grip strength is symmetric.

Regarding gastroesophageal reflux disease and Barrett esophagus, abdominal examination was unremarkable.

(Tr. at 455-56.)

Dr. Beard also provided a "Medical Source Statement of Ability to do Work-related Activities (Physical)" form on January 24, 2007, concluding that Claimant would be limited to the medium level of exertion. (Tr. at 457-60.) He opined that Claimant could occasionally lift/carry 50 pounds, frequently lift/carry 25 pounds, stand and/or walk for about 6 hours in an 8-hour workday. (Tr. at 457.) He found she had no limitations regarding sitting and that her pushing and pulling was mildly affected due to back and knee pain. (Tr. at 458.) Regarding postural limitations, he stated that Claimant could occasionally climb, kneel, crouch, crawl; frequently balance and stoop; and that her only manipulative limitation was in reaching below her waist. (Tr. at 458-59.) Dr. Beard found that Claimant had no visual, communicative, or

environmental limitations.   (Tr. at 459-60.)

<u>Additional Evidence Presented to the Appeals Council</u>

On August 1, 2007, Kris G. Murthy, M.D. stated that Claimant was seen on that date for a first time neurological consultation for syncopal episodes.  (Tr. at 611-13.)   Dr. Murthy stated:

> She presents an approximately one-year history of what she describes as "passing out" episodes.  She tells me she has passed out approximately "fifty times."   The so-called passing out episodes usually begin with a sensation of "funny feeling" followed by lightheadedness, loss of balance and subsequent falling to the floor. There is no loss of consciousness described.  A "dazed" feeling is also described.  The whole episode last for a few seconds... She describes chronic headaches that occur almost every day... She also describes migraine headaches that occur once a month with photophobia and phonophobia that last all day.
>
> She tells me she was involved in an automobile accident on January 26, 2005.  She suffered a head injury as a result of this accident.  Ever since this accident she has had headaches and dizziness.  She has also been passing out in the last one year.  This lady is treated for depression at this time...
>
> Examination: General examination reveals an adult, white female in no acute respiratory distress.
>
> Vital Signs:  Height of 5' 4".  Weight of 278 lbs. Temperature of 97.1 degrees.  Pulse rate of 56. Respiration of 18.  Blood pressure of 122/80...
>
> Neurological Examination:  Mental Status examination reveals she is awake, alert and oriented to time, place, person and current events. Speech is clear. Language is intact.  Memory is intact for immediate, present and remote memory.  Calculation, insight and judgment are intact.  There is no evidence of depression...
>
> Cranial nerve examination does not reveal any ptosis of the eyelids or nystagmus.  Pupils are equal and reactive to light and accommodation.  Extraocular muscles are intact.  Visual fields are full.  Fundoscopy does not

16

reveal any papilledema or hemorrhage. There is no facial weakness noted. There are no facial sensory deficits noted. There are no hearing deficits noted. Tongue is in midline without any atrophy or fasciculation.

Neck examination does not reveal any rigidity, thyromegaly or lymphadenopathy. There is no carotid bruit appreciated. Range of motion of the neck is full. There is no tenderness noted in the shoulder.

Motor examination reveals normal tone. Bulk is symmetrical without any atrophy. Motor strength is 5+/5+ bilaterally symmetrical. Deep tendon reflexes are 2+ bilaterally symmetrical, in both the upper and lower extremities. Plantar stimulation does not elicit any pathological Babinski reaction.

Sensory examination is intact for pain, position sense and vibration sense.

Coordination examination does not reveal any tremors or pronator drift. There is no finger-nose-finger dysmetria noted. Gait is within normal limits. Romberg's sign is noted. There are no cerebellar signs appreciated.

Impression:
1.   Dizziness. The so-called passing out episodes related to dizziness likely from vestibular dysfunction, especially in the background of hearing deficits and tinnitus.
2.   Dizziness related to vestibular dysfunction.
3.   Chronic headaches, tension headaches. Risk factors include depression and history of head injury from the motor vehicle accident in January 2005.
4.   Positive Romberg's signs which could be secondary to B12 deficiency affecting long tracts.
5.   Depression.
6.   Asthma.
7.   Hyperlipidemia.
8.   Gatroesophageal reflux disease.
9.   Barrett's esophagus.
10. History of carpal tunnel syndrome.
11. Migraine headaches.
12. Tachycardia.

Recommendations: Meclizine 25 mg. p.o. three times a day. I recommend an MRI of the brain, carotid duplex study, B12 and folate levels, T4, TSH, tilt table test looking

17

for orthostasis, comprehensive metabolic panel and CBC.
She is advised not to drive at this time.  I will review
the above diagnostic studies, re-evaluate her and make
further recommendations.

(Tr. at 611-13.)

Appointment Encounter Records from MGH show claimant had
"routine" check-ups on September 24, 2007, October 30, 2007, and
November 29, 2007 to discuss pain, medications, and high glucose.
(Tr. at 596-98.)

On November 29-30, 2007, Claimant had a polysomnography at the
Sleep Disorder Center of Thomas Memorial Hospital.  An unsigned
report dated November 30, 2007, stated that the test indicated
"Sleep Disordered Breathing... There was severe snoring during the
recording.  Respiratory events were mild."  (Tr. at 599-601.)

An Appointment Encounter Record from MGH dated December 27,
2007 indicates Claimant had a "physical exam for medical card".
(Tr. at 595.)

An undated letter from Claimant, faxed on January 8, 2008,
stated in part:

> I am filing an appeal because I feel you haven't thought
> of everything you're doctor and specialists kind of
> summed everything up as me just being obese, but I was in
> 5 different car wrecks since 1999 and my pain was bad
> enough to quit work before my big weight gain and I know
> that having this extra weight doesn't help but it is not
> the reason for my pain... I am planning to get that
> weight loss surgery Lapband because since the meds have
> caused some of my weight gain, and I am not able to do
> intense exercise to lose weight because it hurts to
> badly.

(Tr. at 592-93.)

18

On January 11, 2008 and May 5, 2008, Claimant representative wrote letters to the Appeals Council.  (Tr. at 604-07, 614-18.)

On April 5, 2008, Claimant wrote a "To Whom It May Concern" letter stating

> I tried to get my appointment with my new pain doctor. I have an appointment May 22nd it took months to get it approved and then get the appointment. I would just like to reaffirm to you that I am in more pain and can do less and less every day and I know my weight gain hasn't helped but I had the constant pain and less range of motion BEFORE my weight gain.  I am on a new program. I've already lost 25 lbs. So once the weight is no longer an issue I will still be in pain.  I have been in to many accidents, and I have my Mother and her Mothers dibilitating [sic] genes.   I wish I didn't.   My Grandmother ended up in a wheelchair and now my Mom is getting one... Sorry I'm sending this so late my sister was supposed to fax it this morning, because today was one of those days I couldn't get out of bed.

(Tr. at 610.)

On May 22, 2008, records indicate Claimant saw David L. Caraway, M.D., at St. Mary's Hospital for a "pain new patient visit."  (Tr. at 608-09.)

On November 29, 2008, Claimant had another Sleep Study at Thomas Memorial Hospital.  On January 8, 2008, Mallinath Kayi, M.D., reported "No obstructive apneas are seen... The study is inconclusive since the patient did not go into REM sleep.  She had minimal hypopneas with index of 3.6, severe snoring... The patient would very much benefit from weight loss."  (Tr. at 603.)

Psychiatric Evidence

Records indicate Claimant received intermittent services at

New Hope Christian Counseling Center from August 9, 1996 to April 4, 2006. (Tr. at 338-52, 410-18.) Although the handwritten notes are largely illegible, a typed note dated January 27, 2005 is signed by Charles Scharf, M.D. This note is "To Whom It May Concern" and states Claimant is being treated for "Major Depressive Disorder" and that "[d]ue to her current condition, she is not capable of sustaining gainful employment at this time." (Tr. at 344.)

On July 23, 2005, a State agency medical source completed a Psychiatric Review Technique form. (Tr. at 292-306.) The evaluator, Robert W. Solomon, Ph. D., found Claimant's impairment was not severe regarding her affective disorders of Major Depressive Disorder and Generalized Anxiety Disorder. (Tr. at 292, 295, 297.) He found Claimant had no limitation regarding restriction of activities of daily living, mild difficulties in maintaining concentration, persistence, or pace, and in maintaining social functioning, and no episodes of decompensation. (Tr. at 302.) He stated that the evidence does not establish the presence of the "C" criteria. (Tr. at 303.) Dr. Solomon noted:

> Some brief psych. [psychological] /MH HxTx [mental health history treatment]; OP [outpatient] psych. only. Does have meds [medications]; anti-depressant, & MER [medical evidence of record] is replete w/ comments @ "-improvement(s) (on meds.)" MSE [mental status evaluation] (brief) @ shows domains WNL [within normal limits]. ADL [activities of daily living] c/o [complaints of] psych. Decrements: Her c/o are predominately physical, but she does note "(I'm) forgetful." She is partially credible b/c [because] she

20

> does have Dx [diagnosis] of & Tx [treatment] for psych.
> restrictions, but no MER or MSE mentions her c/o.

(Tr. at 304.)

On March 24, 2006, a State agency medical source completed a Psychiatric Review Technique form. (Tr. at 353-66.) The evaluator, James Binder, M.D., found Claimant's impairment was not severe regarding her affective disorders of depression and anxiety. (Tr. at 353, 356, 358.) He found Claimant had mild limitation regarding restriction of activities of daily living, difficulties in maintaining concentration, persistence, or pace, and in maintaining social functioning, and no episodes of decompensation. (Tr. at 363.) He stated that the evidence does not establish the presence of the "C" criteria. (Tr. at 364.) Dr. Binder noted: "Credibility: Clmt [claimant] not fully credible: multiple allegations without medical evidence support; function ability limitations not supported by medical evidence." (Tr. at 365.)

On March 7, 2007, Claimant self-admitted to the inpatient psychiatric unit at Thomas Memorial Hospital due to "worsening of neurovegetative symptoms of depression and experiencing suicidal ideation." (Tr. at 538.) Mark Hughes, M.D. discharged Claimant on March 13, 2007 with a diagnosis of major depressive disorder. (Tr. at 538-40.) The discharge summary states:

> She was willing to follow up on an outpatient basis at
> New Hope Christian Counseling after her discharge. She
> was encouraged to ventilate her feelings and identify
> stressors that lead to decompensation of her mood. She
> received individual therapy as well as process group

21

therapy.    She  discussed  those  security  issues,  her
mother's  carcinoma,  her  grandmother's  carcinoma,  her
conflicts  with  her  youngest  daughter  and  financial
stressors... She  was  upset  over  not  being  able  to  lose
weight.  She was 5 feet 4 inches and weighed 260 pounds.
The  therapist  encouraged  her  to  make  behavioral  changes
and  to  work  on  refuting  irrational  thoughts...  As
treatment  progressed,  her  mood  improved...  The  patient
was  tolerating  her  medications  without  difficulty  and  was
stable  for  discharge  on  March  13,  2007.

(Tr. at 538-39.)

Claimant's Challenges to the Commissioner's Decision

Claimant  asserts  that  the  Commissioner's  decision  is  not
supported  by  substantial  evidence  because  (1)  the  ALJ  failed  to
properly evaluate Claimant's pain as a disabling condition; (2) the
ALJ  improperly  discounted  Claimant's  anxiety  and  depression;   and
(3)  the  ALJ  failed  to  consider  the  combination  of  Claimant's
impairments.   (Pl.'s Br. at 13-17.)

The  Commissioner  argues  that  the  ALJ's  finding  that  Claimant
is  not  disabled  is  supported  by  substantial  evidence  because  (1)
the  ALJ's  credibility  finding  correctly  considered  Claimant's
alleged  pain;  (2)  the  ALJ  properly  considered  Claimant's  anxiety
and  depression;  and  (3)  that  the  ALJ  fully  complied  with  the
regulations  when  he  assessed  Claimant's  combined  impairments.
(Def.'s Br. at 7-11.)

Pain Analysis and Credibility Determination

Claimant  first  asserts  that  the  ALJ  failed  to  properly
evaluate her pain as a disabling condition.  (Pl.'s Br. at 14-15.)
Specifically, Claimant argues:

The ALJ correctly found the plaintiff has a severe impairment of fibromyalgia, carpal tunnel syndrome, arthritis, and back pain. The record is full of the plaintiff's complaints of pain and discomfort. The ALJ erred in his decision. The evidence is present in this matter and it clearly shows that the plaintiff's pain renders her disabled.

(Pl.'s Br. at 14.)

The Commissioner responds that Claimant's assertion has no merit because the ALJ supported his credibility finding and correctly weighed the evidence concerning Claimant's alleged pain. (Def.'s Br. at 7-10.) Specifically, the Commissioner argues:

While Plaintiff may experience some pain and discomfort from her fibromyalgia and carpal tunnel syndrome, the evidence in this case suggests that she does not experience a disabling degree of pain and limitation from these conditions... As the ALJ found, Plaintiff's testimony about her degree of pain was inconsistent with her daily activities and her unremarkable findings during the consultative examination... The ALJ noted that although Plaintiff alleged constant pain "all over," her daily activities had not significantly diminished, and her muscle strength and ability to engage in physical activities such as walking was unimpaired (Tr. 30)... The ALJ's more than 4-page discussion of credibility demonstrates that his finding on this issue was based upon substantial evidence (Tr. 27-31).

(Def.'s Br. at 9-10.)

A two-step process is used to determine whether a claimant is disabled by pain. First, objective medical evidence must show the existence of a medical impairment that reasonably could be expected to produce the pain alleged. 20 C.F.R. §§ 404.1529(b) and 416.929(b) (2007); SSR 96-7p, 1996 WL 374186 (July 2, 1996); see also, Craig v. Chater, 76 F.3d 585, 594 (4th Cir. 1996). If such

23

an impairment is established, then the intensity and persistence of the pain and the extent to which it affects a claimant's ability to work must be evaluated. <u>Craig</u>, 76 F.3d at 595. When a claimant proves the existence of a medical condition that could cause pain, "the claimant's subjective complaints [of pain] must be considered by the Secretary, and these complaints may not be rejected merely because the severity of pain cannot be proved by objective medical evidence." <u>Mickles v. Shalala</u>, 29 F.3d 918, 919 (4th Cir. 1994). Objective medical evidence of pain should be gathered and considered, but the absence of such evidence is not determinative. <u>Hyatt v. Sullivan</u>, 899 F.2d 329, 337 (4th Cir. 1990). A claimant's symptoms, including pain, are considered to diminish his capacity to work to the extent that alleged functional limitations are reasonably consistent with objective medical and other evidence. 20 C.F.R. §§ 404.1529(c)(4) and 416.929(c)(4) (2007). Additionally, the regulations provide that:

> [w]e will consider all of the evidence presented, including information about your prior work record, your statements about your symptoms, evidence submitted by your treating, examining, or consulting physician or psychologist, and observations by our employees and other persons. . . . Factors relevant to your symptoms, such as pain, which we will consider include:
>
> (I) Your daily activities;
>
> (ii) The location, duration, frequency, and intensity of your pain or other symptoms.
>
> (iii) Precipitating and aggravating factors;
>
> (iv) The type, dosage, effectiveness, and side

24

effects of any medication you take or have taken to alleviate your pain or other symptoms;

(v) Treatment, other than medication, you receive or have received for relief of your pain or other symptoms;

(vi) Any measures you use or have used to relieve your pain or other symptoms (e.g., lying flat on your back, standing for 15 or 20 minutes every hour, sleeping on a board, etc.); and

(vii) Other factors concerning your functional limitations and restrictions due to pain or other symptoms.

20 C.F.R. §§ 404.1529(c)(3) and 416.929(c)(3) (2007).

SSR 96-7p repeats the two-step regulatory provisions:

First, the adjudicator must consider whether there is an underlying medically determinable physical or mental impairment(s)--i.e., an impairment(s) that can be shown by medically acceptable clinical and laboratory diagnostic techniques--that could reasonably be expected to produce the individual's pain or other symptoms. * * * If there is no medically determinable physical or mental impairment(s), or if there is a medically determinable physical or mental impairment(s) but the impairment(s) could not reasonably be expected to produce the individual's pain or other symptoms, the symptoms cannot be found to affect the individual's ability to do basic work activities.

Second, once an underlying physical or mental impairment(s) that could reasonably be expected to produce the individual's pain or other symptoms has been shown, the adjudicator must evaluate the intensity, persistence, and limiting effects of the individual's symptoms to determine the extent to which the symptoms limit the individual's ability to do basic work activities. For this purpose, whenever the individual's statements about the intensity, persistence, or functionally limiting effects of pain or other symptoms are not substantiated by objective medical evidence, the adjudicator must make a finding on the credibility of the individual's statements based on a consideration of the entire case record.

25

SSR 96-7p, 1996 WL 374186, at *2.   Significantly, SSR 96-7p requires the adjudicator to engage in the credibility assessment as early as step two in the sequential analysis; i.e., the ALJ must consider the impact of the symptoms on a claimant's ability to function along with the objective medical and other evidence in determining whether the claimant's impairment is "severe" within the meaning of the regulations.  A "severe" impairment is one which significantly limits the physical or mental ability to do basic work activities.  20 C.F.R. §§ 404.1520(c) and 416.920(c).

Craig and SSR 96-7p provide that although an ALJ may look for objective medical evidence of an underlying impairment capable of causing the type of pain alleged, the ALJ is not to reject a claimant's allegations solely because there is no objective medical evidence of the pain itself.  Craig, 76 F.3d at 585, 594; SSR 96-7p, 1996 WL 374186, at *2 ("the adjudicator must make a finding on the credibility of the individual's statements based on a consideration of the entire case record").  For example, the allegations of a person who has a condition capable of causing pain may not be rejected simply because there is no evidence of "reduced joint motion, muscle spasms, deteriorating tissues [or] redness" to corroborate the extent of the pain.  Craig, 76 F.3d at 595. Nevertheless, Craig does not prevent an ALJ from considering the lack of objective evidence of the pain or the lack of other corroborating evidence as factors in his decision.  The only

26

analysis which <u>Craig</u> prohibits is one in which the ALJ rejects allegations of pain <u>solely</u> because the pain itself is not supported by objective medical evidence.

As noted by the Commissioner, the ALJ provided more than a 4-page discussion of Claimant's credibility.  (Tr. at 27-31; Def.'s Br. at 10.)  In the decision, the ALJ made these findings as to the evidence concerning Claimant's alleged pain and Claimant's credibility:

> After considering the evidence of record, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to produce the alleged symptoms, but that the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible.

> The claimant alleges increasing pain, but Social Security regulations provide an individual's subjective complaints shall not alone be conclusive evidence of disability. She has been diagnosed with fibromyalgia and arthritis, which is likely to cause some limitations, and the residual functional capacity determined in this decision has been reduced to accommodate limitations resulting from the claimant's fibromyalgia and arthritis and complaints of pain. However, the undersigned cannot find the claimant's allegations that she is incapable of all work activity to be credible because of the significant inconsistencies in the record and lack of objective medical evidence.  The totality of the medical records reveals that the claimant is able to engage in basic work activities despite the limitations resulting from her impairments.

> The claimant was examined at Gauley Bridge Health Center on February 16, 2004.  She reported involvement in two motor vehicle accidents... She had full range of motion of the upper and lower extremities and strength testing was equal and strong bilaterally.  Straight leg raise testing appeared to be negative on exam.  On neurological exam, upper and lower extremity reflexes were within normal limits.  Examination on March 17, 2005, was within

normal limits except for sore throat, cough, and shoulder pain/fibromyalgia (Exhibit 2F)... Bilateral knee x-ray examinations dated October 19, 2006, were negative (Exhibit 19F)... Dr. Beard examined the claimant on January 24, 2007... Evaluation of range of motion revealed no limitations... On neurological exam, there was no evidence of weakness on manual muscle testing... X-ray examinations of the claimant's lumbar and cervical spine dated May 17, 2007, were negative.

There are several discrepancies in the record. On May 5, 2005, the claimant reported that she usually goes to the beach for a week in June, despite allegations of symptoms and limitations preventing all work. Although a vacation and a disability are not mutually exclusive, the claimant's decision to go on vacation tends to suggest that the alleged symptoms and limitations may have been overstated. She also reported, as noted above, that she goes to her friend's house, when out of town, and cares for her dogs and cats, to include emptying litter boxes. She indicated that she attends ball games when her daughters cheer (Exhibit 5E). At the hearing, the claimant testified that she began having difficulty working due to physical problems. She stated that she got a medical card and the doctors found more things wrong with her. She had major problems with pain until "they could decide what to give me, what not to give me, and what to do." This statement clearly indicates that the claimant's pain has been relieved by appropriate treatment. In fact, at the hearing, the claimant testified that her wrist, back and ankle braces have helped. She testified that she can now load the dishwasher and fold a load of laundry. She stated that the pain does not "hurt near as much" since using the back brace and she can now walk through Walmart without experiencing severe pain. She also testified that her daughter's boyfriend gives her massages, which also relieves her pain. She testified that her hands were staying numb but her medications have helped. She stated that she can write a check and complete a page of paperwork. Furthermore, the undersigned observed that the claimant betrayed no evidence of pain or discomfort while testifying at the hearings. While the hearings were short-lived and cannot be a conclusive indicator of the claimant's overall level of pain on a day-to-day basis, the apparent lack of discomfort during the hearing is given some slight weight in reaching the conclusion regarding the credibility of the claimant's allegations

and the claimant's residual functional capacity.

As to the effectiveness of treatment, the claimant's testimony indicates that the treatment has been generally successful in controlling her symptoms. Furthermore, although the claimant has received treatment for allegedly disabling impairments, her treatment has been essentially routine and/or conservative in nature. Although the claimant has alleged drowsiness as a result of her medications, the record generally indicates that this side effect would not interfere with the claimant's ability to perform work activities in any significant manner. The claimant has described daily activities which are not limited to the extent one would expect, given the complaints of disabling symptoms and limitations. At times, however, she greatly minimized her activities of daily living. There is no basis in the record to support such decreased activities. In fact, the objective findings reveal that the claimant can perform at least the exertional demands of light work [per the opinions of State agency medical experts A. Rafael Gomez, M.D. and Amy Wirts, M.D., and examining physician Kip Beard, M.D.]...

The claimant's residual functional capacity as determined in this decision is fully supported when considering the claimant's testimony and written statements in connection with the clinical facts, medical findings, and opinions of the treating, examining, and non-examining physicians.

(Tr. at 28-31.)

In his decision, the ALJ determined that Claimant had medically determinable impairments that could cause her alleged symptoms. (Tr. at 20-31.) The ALJ's decision contains a thorough consideration of Claimant's daily activities, the location, duration, frequency, and intensity of Claimant's pain and other symptoms, precipitating and aggravating factors, Claimant's medication and side effects, and treatment other than medication. (Tr. at 20-31.) The ALJ explained his reasons for finding Claimant

29

not entirely credible, including the objective findings, the conservative nature of Claimant's treatment, the lack of evidence of side effects which would impact Claimant's ability to perform her past relevant work, and her broad range of self-reported daily activities. (Tr. at 30-31.)

With respect to Claimant's argument that the ALJ wrongfully discredited Claimant's credibility and subjective complaints of pain, the court **FINDS** that the ALJ properly weighed Claimant's credibility and subjective complaints of pain in keeping with the applicable regulations, case law, and social security ruling ("SSR") and that his findings are supported by substantial evidence.   20 C.F.R. § 404.1529(b) (2006); SSR 96-7p, 1996 WL 374186 (July 2, 1996); Craig v. Chater, 76 F.3d 585, 594 (4th Cir. 1996).

Mental Impairment Analysis

Claimant next asserts that the ALJ improperly discounted Claimant's anxiety and depression. (Pl.'s Br. at 14-15.) Specifically, Claimant argues:

> The ALJ relied upon part of the evidence in the record to the exclusion to the record as a whole in making his decision.   He has specifically discounted evidence regarding the plaintiff's anxiety and problems with her nerves and depression... The Commissioner has chosen to ignore certain of the medical findings found in the record as well as the testimony of the plaintiff regarding the pain and limitations on her ability to perform her past relevant work and any other substantial gainful employment.  The ALJ relied only upon part of the evidence in this case constitutes his decision as being totally incorrect.

30

> The record reflects several instances whereas the
> plaintiff was diagnosed as having anxiety... The
> Commissioner should have taken the plaintiff's anxiety
> into consideration when determining that the plaintiff
> was not disabled. The record clearly shows that the
> plaintiff did suffer from anxiety and that this is a
> condition [that] can render a person disabled and also
> can, when combined with other impairments, render a
> person disabled.

(Pl.'s Br. at 14-15.)

The Commissioner responds that Claimant's assertion has no merit because the ALJ correctly considered the evidence concerning Claimant's psychological conditions. (Def.'s Br. at 7-10.) Specifically, the Commissioner argues:

> Respecting Plaintiff's psychological symptoms, the ALJ
> gave great weight to the opinion of state agency
> psychologists Solomon and Binder (Tr. 24, 363-66). See
> 20 C.F.R. §§ 404.1527(f), 416.927(f) and SSR 96-6p
> ("state agency physicians and psychologists are
> considered to be highly qualified physicians...who are
> also experts in Social Security disability evaluation").
> The ALJ also independently reviewed the evidence of
> record and concluded that Plaintiff had no impairment in
> the functional, B-criteria of the Listings (Tr. 24-25).
> The ALJ's decision includes approximately 12 pages of
> discussion of the medical evidence of record, and
> citation to specific exhibits (Tr. 18-33). As the ALJ
> noted, although Plaintiff alleges multiple medical
> problems, her conditions have [been] responsive to
> conservative treatment with medications (Tr. 21-24).
> Plaintiff's brief does not identify the evidence that the
> ALJ allegedly overlooked (Pl. Br. 17-18)... there was
> substantial evidence in the record to support the ALJ's
> findings.

(Def.'s Br. at 7.)

When evaluating a claimant's mental impairments, the Social Security Administration uses a special sequential analysis outlined at 20 C.F.R. §§ 404.1520a and 416.920a. First, symptoms, signs, and

31

laboratory findings are evaluated to determine whether a claimant has a medically determinable mental impairment. §§ 404.1520a(b)(1) and 416.920a(b)(1)(2006). Second, if the ALJ determines that an impairment(s) exists, the ALJ must specify in his/her decision the symptoms, signs, and laboratory findings that substantiate the presence of the impairment(s). §§ 404.1520a(b)(1) and (e), 416.920a(b)(1) and (e)(2006). Third, the ALJ then must rate the degree of functional limitation resulting from the impairment(s). §§ 404.1520a(b)(2) and 416.920a(b)(2)(2006). Functional limitation is rated with respect to four broad areas (activities of daily living, social functioning, concentration, persistence or pace, and episodes of decompensation). §§ 404.1520a(c)(3) and 416.920a(c)(3) (2005). The first three areas are rated on a five-point scale: None, mild, moderate, marked, and extreme. The fourth area is rated on a four-point scale: None, one or two, three, four or more. §§ 404.1520a(c)(4) and 416.920a(c)(4) (2006). A rating of "none" or "mild" in the first three areas, and a rating of "none" in the fourth area will generally lead to a conclusion that the mental impairment is not "severe," unless the evidence indicates otherwise. §§ 404.1520a(d)(1) and 416.920a(d)(1) (2006). Fourth, if a mental impairment is "severe," the ALJ will determine if it meets or is equivalent in severity to a mental disorder listed in Appendix 1. §§ 404.1520a(d)(2) and 416.920a(d)(2) (2006). Fifth, if a mental impairment is "severe" but does not meet the criteria

32

in the Listings, the ALJ will assess the claimant's residual functional capacity. §§ 404.1520a(d)(3) and 416.920a(d)(3) (2006). The ALJ incorporates the findings derived from the analysis in the ALJ's decision:

> The decision must show the significant history, including examination and laboratory findings, and the functional limitations that were considered in reaching a conclusion about the severity of the mental impairment(s). The decision must include a specific finding as to the degree of limitation in each of the functional areas described in paragraph (c) of this section.

§§ 404.1520a(e)(2) and 416.920a(e)(2) (2006).

In the decision, the ALJ articulated his findings as to functional limitations resulting from Claimant's depression and anxiety:

> With regard to the claimant's mental impairments, the file contains records from the New Hope Christian Counseling Center dated August 9, 1996 to April 4, 2006. Treatment notes indicate that much of the claimant's complaints were situational related to her home situation and relationship with her daughter. On February 25, 2003, it was noted that the claimant underwent a sleep study which revealed a "very low end scale" of sleep apnea. On May 13, 2003, it was noted that the claimant's anxiety was "not bad" and her mood was fair. On December 30, 2003, the claimant's affect was bright and giggly. On August 12, 2004, it was noted that the claimant's Lexapro was working well for depression. The claimant's mood was good and she was "in good spirits." By letter dated January 27, 2005, Charles Scharf, M.D., reported that the claimant was under his care for treatment of major depressive disorder. Dr. Scharf opined that the claimant due to her current condition, was not capable of sustaining gainful employment. On May 3, 2005, it was noted that the claimant's depression was under control and her anxiety was much improved. On January 31, 2006, it was noted that the claimant's sleep was improving. (Exhibits 8F and 15F). The undersigned gives the opinion

of Dr. Scharf no weight as it is inconsistent with the treatment notes. The possibility always exists that a doctor may express an opinion in an effort to assist a patient with whom he or she sympathizes for one reason or another. While it is difficult to confirm the presence of such motives, they are more likely in situations where the opinion in question departs substantially from the rest of the evidence of record, as in the current case.

The claimant was admitted to the inpatient psychiatric unit of an area hospital on March 7, 2007. She reported that her grandmother was ill with terminal carcinoma, she was having difficulty getting her children to school on time, she was in trouble with the prosecutor regarding her being truant, and she lost her check and food stamps because of a settlement which she did not report. As treatment progressed, the claimant's mood improved. She was advised to follow up with Dr. Scharf at New Hope Christian Counseling. However, at the hearing, she testified that she has not received psychiatric treatment since her release. Again, this instance is clearly indicative of situational depression due to compiled stressors (Exhibit 21F).

Robert Solomon, Ed.D., a State agency medical expert, reviewed the evidence of record and completed a Psychiatric Review Technique form on July 23, 2005. Dr. Solomon opined that the claimant had no severe mental impairment... (Exhibit 4F).

James Binder, M.D., a State agency medical expert, reviewed the evidence of record and completed a Psychiatric Review Technique form on March 24, 2006. Dr. Binder opined that the claimant has no severe mental impairment, with only mild restriction of activities of daily living and mild difficulties in maintaining social functioning and concentration, persistence, or pace...no episodes of decompensation of extended duration (Exhibit 9F).

The undersigned gives great weight to Drs. Solomon and Binder's opinions that the claimant has no severe mental impairment. However, for reasons discussed below, the undersigned finds that the claimant has no limitations with regard to the "B" criteria of the Listings. The medical evidence establishes that the claimant has exhibited some of the features of the "A" criteria of listing 12.04 and 12.06. However, a review of the

34

relevant "B" criteria indicates that none of the functional limitation categories are manifested at a degree which satisfies the full requirements of such listing.

The first are of the "B" criteria, "activities of daily living," includes adaptive activities... By Function Report dated May 5, 2005, the claimant reported that she fixes her daughter's hair for school, does laundry, prepares meals, loads the dishwasher, cares for her friend's pet while her friend is out of town, performs housework, and grocery shops (Exhibit 5E). At the hearing, the claimant testified regarding some restriction [of] activities of daily living due to physical limitations. However, she did not report any restrictions as a result of mental limitations. The undersigned rates the degree of this limitation as none.

The second area of the "B" criteria, "social functioning," refers to an individual's capacity to interact appropriately and communicate effectively with others. By Function Report dated May 5, 2005, the claimant reported that she talks on the telephone, attends her daughter's ball games, and visits her friend and sisters. She reported that she gets along "good" with authority figures (Exhibit 5E). The claimant testified at the hearing that she attends her children's school events and is "a very big people person." Furthermore, the undersigned observed the claimant to interact in a socially appropriate manner throughout the hearing. In fact, she was quite talkative and elaborative. As such, the undersigned rates the degree of this limitation as none.

The third "B" criteria, "concentration, persistence and pace" refers to the ability to sustain focused attention sufficiently long enough to permit timely completion of task commonly found in work settings. By Function Report dated May 5, 2005, the claimant reported that she is able to pay bill, count change, handle a savings account, and use a checkbook/money orders. She indicated that, on a daily basis, she "checks her book" to see if she, her children, mother, or grandmother have a doctor's appointment to attend. She reported that she watches movies, reads magazines and health books, listens to music, and uses the computer (Exhibit 5E). At the hearing, the claimant testified that television is her drug of choice and she loves to read. She testified that

she read the Harry Potter series to her daughter. Given all of the above, the undersigned rates the degree of limitation as none.

The last area of function evaluated under the "B" criteria is deterioration or decompensation in work or work-like settings. This refers to repeated failure to adapt to stressful circumstances which cause the individual to either withdraw from that situation or to experience an increase of signs and symptoms with an accompanying difficulty in maintaining activities of daily living, social relationships and/or maintaining concentration and task persistence. There is no evidence that the claimant has experienced limitation in this area at any relevant time.

(Tr. at 23-25.)

In short, the ALJ was justified in accepting the State agency source opinion that Claimant's mental impairments were not severe. In evaluating the "B" criteria, the ALJ concluded that Claimant had no restrictions in activities of daily living, social functioning and concentration, persistence and pace and no episodes of decompensation, thus leading to a finding that Claimant's mental impairments are not severe. See 20 C.F.R. §§ 404.1520a(d)(1) and 416.920a(d)(1) (A rating of "none" or "mild" in the first three areas, and a rating of "none" in the fourth area will generally lead to a conclusion that the mental impairment is not "severe," unless the evidence indicates otherwise.) The ALJ's determination that Claimant's mental impairments were not severe is in keeping with the applicable regulations and is supported by substantial evidence , and the court proposes that the presiding District Judge so find. 20 C.F.R. §§ 404.1520a and 416.920a (2007).

36

While Claimant disagrees with the ALJ's findings cited above, the court has fully reviewed the record and finds that the ALJ's findings are supported by substantial evidence. The conclusions drawn by the ALJ are reasonable.

The court **FINDS** that the ALJ's analysis of Claimant's mental impairments is in keeping with the applicable regulations and is supported by substantial evidence. In addition, the ALJ complied with the applicable regulations in weighing the evidence of record related to Claimant's mental impairments.

Combination of Impairments

Claimant asserts that the ALJ failed to consider the combination of her impairments and that the ALJ Decision is not supported by substantial evidence because the ALJ disregarded the evidence of Claimant's "anxiety and hand problems as well as her other severe impairments and pain." (Pl.'s Br. at 15-17.) Specifically, Claimant argues:

> The ALJ in this case fractionalized the plaintiff's impairments and considered them in isolation. He did not consider them in combination to determine the impact that they would have on her ability to work. The accumulative effect of the various impairments that the plaintiff suffered should have been analyzed in regard to how they would have an impact on her ability to work. The ALJ failed to take this into consideration. He noted some of her problems existed but he did not put them together and then determine how they would impair her ability to work....
>
> The ALJ disregarded the evidence which is present in the record regarding the plaintiff's anxiety and hand problems as well as her other severe impairments and pain clearly shows that the decision is not supported by

37

substantial evidence.

(Pl.'s Br. at 16-17.)

The Commissioner responds that Claimant's assertion has no merit because

> the hearing transcript shows, at both of Plaintiff's administrative hearings, that the ALJ asked appropriate questions and explored each of Plaintiff's allegedly disabling impairments and the effect of those impairments upon Plaintiff's ability to work (Tr. 26-31, 621-46, 655-85)... the ALJ thoroughly considered and summarized the medical evidence of record and carefully heard Plaintiff's testimony at two hearings (Tr. 26-31). The ALJ did consider Plaintiff's impairments in combination, as shown in his comprehensive decision, and in his hypothetical questions to the vocational expert, which elicited appropriate alternative occupations.

(Def.'s Br. at 10-11.)

The social security regulations provide,

> In determining whether your physical or mental impairment or impairments are of a sufficient medical severity that such impairment or impairments could be the basis of eligibility under the law, we will consider the combined effect of all of your impairments without regard to whether any such impairment, if considered separately, would be of sufficient severity.

20 C.F.R. §§ 404.1523, 416.923 (2007). Where there is a combination of impairments, the issue "is not only the existence of the problems, but also the degree of their severity, and whether, together, they impaired the claimant's ability to engage in substantial gainful activity." Oppenheim v. Finch, 495 F.2d 396, 398 (4th Cir. 1974). The ailments should not be fractionalized and considered in isolation, but considered in combination to determine

38

the impact on the ability of the claimant to engage in substantial gainful activity.  Id.  The cumulative or synergistic effect that the various impairments have on claimant's ability to work must be analyzed.  DeLoatche v. Heckler, 715 F.2d 148, 150 (4th Cir. 1983).

In the decision, the ALJ articulated his findings as to Claimant's combined impairments:

> The undersigned has reviewed the entire evidence of record and finds the claimant's impairments do not meet or equal the criteria of any of the musculoskeletal or neurological listings in Sections 1.00 and 11.00.  A review of the claimant's impairments, including those deemed "not severe" reveals they do not equal the severity of a listed impairment in Appendix 1, Subpart P, Regulations No. 4.  Moreover, the State agency physicians who reviewed the aspects of this claim at the initial and reconsideration level did not find the claimant's impairments met or equaled the listings (Exhibits 3F, 4F, 9F, and 10F).

(Tr. at 25.)

The court **FINDS** that the ALJ properly considered Claimant's impairments alone and in combination.  Claimant cites to a number of impairments and symptoms ["plaintiff's anxiety and hand problems as well as her other severe impairments and pain" (Pl.'s Br. at 17)].  The ALJ considered those impairments, including Claimant's carpal tunnel syndrome, obesity, fibromyalgia, arthritis, and back pain, to be severe and considered them alone and in combination at arriving at his residual functional capacity finding.  Many of the remaining impairments and associated symptoms, the ALJ considered, but found to be non-severe.  In particular, the ALJ found that Claimant's anxiety and depression were not severe impairments.

39

(Tr. at 23-25.)  Despite finding the above impairments to be non-severe, the ALJ considered them in assessing Claimant's subjective complaints, as he is required to do pursuant to SSR 96-8p (Tr. at 20-32.)  SSR 96-8p, 1996 WL 362207, *34477 (July 2, 1996) (In assessing Claimant's pain and credibility, the ALJ should consider the "limitations and restrictions imposed by all of an individual's impairments, even those that are not 'severe.'").

After a careful consideration of the evidence of record, the court finds that the Commissioner's decision is supported by substantial evidence.  Accordingly, by Judgment Order entered this day, the final decision of the Commissioner is AFFIRMED and this matter is DISMISSED from the docket of this court.

The Clerk of this court is directed to transmit this Memorandum Opinion to all counsel of record.

ENTER: March 29, 2010

Mary E. Stanley
United States Magistrate Judge